# Daniel *versus* Daniel.

*Wills.— The Law relative to Privileged Communications.— Testamentary Capacity discussed.*

1. Though capacity to make a will may accompany a great degree of mental imbecility, yet in order to support a will so made, it must be shown that the testator had at the time of making it an intelligent consciousness of the nature and effect of his act, a knowledge of the property he possessed, and an understanding of the disposition he intended to make of it.

2. In an issue of *devisavit vel non*, the fact that the testator was too imbecile to make communications to his counsel when they met, is not incompetent testimony, on account of the professional relation: professional communications are privileged: but the fact that imbecility prevented them from being made, is not.

3. Where the only issue trying was as to the testator's competency, the ruling of the court, which would have been erroneous on the question of undue influence, but is harmless as to the real issue, is no ground for reversing the judgment: nor is the admission of evidence pertinent to the issue of undue influence but irrelevant to that of testamentary capacity.

4. There is no practical distinction between the ability of a testator to make a will, and his capacity to understand it, and the result will not be affected if a witness answers one question when asked the other.

5. Refinement of distinctions in raising and ruling questions of evidence, by counsel and court, disapproved.

6. Judgment will not be reversed for the reason that testimony was rejected, when the distinction between it and other evidence received, is slight and

[Daniel *v.* Daniel.]

unimportant: nor because a party is not permitted to ask a question, when it is apparent from the testimony of the witness that he would not have given the answer sought: nor for any rulings of the court on any side issue, such as the character of one not a party to the record nor a witness in the cause.

ERROR to the Common Pleas of *Northampton county.*

This was a feigned issue upon a precept from the Register's Court, to try certain disputed facts relating to a paper writing, purporting to be the last will and testament of John Daniel, deceased, in which Robert Daniel, William Lerch and Catharine his wife, late Catharine Daniel; Daniel Rudolph and Matilda his wife, late Matilda Daniel; Joseph Daniel, and Owen Leopold and Maria his wife, late Maria Daniel, were plaintiffs: and William Daniel, Charles Daniel, and Ephraim Daniel, were defendants.

John Daniel died some time in September 1859, having made a will, which was offered for probate on the 1st of October 1859. Objection being made to this by certain of the brothers and sisters of deceased, who averred that the writing purporting to be the will of the deceased was procured to be made through undue influence and imposition exercised upon the testator; and that he was, at the time of the making of the said alleged will, of unsound mind, and requesting an issue to try by jury the truth of the said allegations; the precept of the register was sent to the Common Pleas, directing the entry of an action therein for this purpose.

An issue was accordingly framed, and a declaration on a wager, with the usual plea and replication filed. On the trial, the plaintiff called Mr. Wright, who testified as follows:—

"I knew John Daniel; my acquaintance with him commenced five or six years ago, soon after the death of his father. I first saw him in Allentown, in my office; saw him very often after that—ten or twelve times a year—possibly not so often. I was concerned for him some years ago. I never was applied to by him. On that occasion his brother Samuel applied to me for him; don't think I saw John then; had not seen him then; he never was there alone; always came in company with others. I never conversed with John about the matter; don't recollect that he ever was present about that business. I never spoke with him about that matter. I never had any conversation with John in my life; never could have any conversation with him worth repeating."

The defendants, by their counsel, objected to any evidence of anything that transpired between the witness and his client, John Daniel, in their consultations; and also to the witness stating any of the conduct or manner of John Daniel during such interviews, or any inference drawn by the witness from such manner or conduct.

The plaintiffs, by their counsel, then offered to ask the witness

[Daniel v. Daniel.]

the following question, to wit:—"Why could you have no conversation with him worth repeating, and explain what you mean by this?" to which the defendants, by their counsel, objected, as coming within the objection made above; but the court overruled the objection, and allowed the question to be asked, which was the subject of the first bill of exceptions.

The witness then proceeded to state what transpired in his interviews with John Daniel, describing his personal appearance, manner, and conduct, and gave it as his opinion that he was not competent to make a will, or to transact any business whatever. He also, in the course of his testimony, admitted that what passed between him and the deceased at their interviews, was as counsel and client; but averred that, although the business in which he was at times engaged was *for* John Daniel, he never was employed directly by him, nor held any business communication with him, except in the presence and with the assistance of one or other of his brothers. The same witness also narrated a conversation which he had with Charles Daniel, one of the defendants and executors in the alleged will, on the subject of writing a will for John, which the witness declined doing, on the ground that John was not competent to make a valid will; and because, also, if anything of the kind was done, it would renew a family quarrel which had been commenced years before, in relation to the will of the father of these parties.

In the examination of this witness, a number of questions were asked and answered under exception on the part of the defendants. A number of other witnesses were also examined on both sides, upon the question of the testator's sanity, and a number of exceptions taken to the admission and rejection of the evidence offered, all which are set forth in the specifications of error. The counsel for the plaintiffs presented the following points, on which the instruction of the court was requested:—

1. If the jury believe John Daniel to have been incapable of making a will at any time prior to the making of the alleged will, they must find for the plaintiffs, unless convinced beyond a doubt that he had recovered, or acquired and retained capacity to make a will at the time he undertook to make it.

2. The jury are bound to find for the plaintiffs, though they do not believe John Daniel to have been insane, if they believe him to have been so feeble in mind as to have been unable to know the property he possessed, or of appreciating the effect of any disposition he might make of it.

3. The jury are bound to find for the plaintiffs, though they do not find the imbecility of John Daniel's mind to have been very gross, if they find that his weakness, such as it was, was sufficiently taken advantage of to prevent the alleged will, as made, from being the expression of his unbiassed free will.

3 Wr.—13

[Daniel *v.* Daniel.]

4. The jury are bound to find for the plaintiffs, if they believe that the influence exerted, though it would have been harmless in an ordinary case, was sufficient to destroy the free will of a man of John Daniel's degree of imbecility.

5. The will having been made in the house and presence of the person who takes a large pecuniary benefit under it, and opening with a large bequest to him, made at his own prompting, these circumstances are sufficient to entitle the plaintiffs to a verdict, in the absence of the most decisive proof of the complete absence of influence at the preparation and making of the asserted will, and unimpeachable evidence of unbiassed volition, and of clear capacity, shown by instructions coming from the deceased himself.

6. The question is not whether John Daniel had capacity to understand the particular will in question, but whether he had capacity and information enough to disregard any attempt which may have been made to mislead him.

7. Though the deceased was under no necessity to recall his property, *piece-meal*, to mind, yet, if he had not that amount of mind which enabled him to know and understand what property he had, and how he wished to dispose of it, the will is void.

8. The jury cannot find John Daniel to have had a disposing mind, if they do not believe him to have had mind enough to choose intelligently between one disposition and another.

9. If John Daniel had not mind enough to understand the difference between one sum of money and another, he had not mind enough to make an intelligent disposition of his estate.

The counsel for defendant requested the court to instruct the jury:—

1. Proof of a man's incapacity to transact his business generally, does not show him to be incompetent to make a will.

2. A man may have great imbecility of mind, and approach so nearly to idiocy as to make it difficult to distinguish him from an idiot, and to lead ordinary observers into the belief that he is almost an idiot, and yet be competent to make a will.

3. To set aside a will on the ground of idiocy, it must be shown that the testator was an actual idiot, or of so great imbecility of mind, approaching so near to idiocy, as that he is unable to understand the will which he has made.

4. If the testator was competent to form the resolution and purpose expressed in his will, even though he was unable to specify every part of his property, or name every one of his kindred, he was competent to make a will.

5. If the testator, in making the alleged will, was able to understand the nature of the act in which he was engaged, he had sufficient testamentary capacity.

6. If the facts stated by the witnesses do not satisfy the jury

of the testator's incapacity, the witnesses' opinions are entitled to little or no weight.

The court below (FINDLAY, P. J.) charged the jury as follows:—

"This is a feigned issue from the Register's Court, in which some of the brothers of John Daniel, and his sisters and their husbands, are plaintiffs, and three of his brothers, viz., William, Charles, and Ephraim are defendants. It is sent into this court to ascertain, 1. Whether the paper offered for probate as the will of John Daniel, was procured by undue influence; 2. Whether, at the time of the execution of the said alleged will, the testator was of sound and disposing mind and memory or not.

"The plaintiffs allege that the execution of the paper was procured by undue influence, and that the testator was at the time of the execution thereof, of unsound mind, and incapacitated from making the will. If either of these allegations is true, the will is void, and of no effect. The burden of proving them is on the plaintiffs who allege them.

"First, then, was there any undue influence exercised upon John Daniel by Charles Daniel, in procuring this will to be made? and of this I see no evidence. Undue influence is such as produces a restraint upon the will of the testator. A man has a right, by fair persuasion, to induce another to make a will in his own favour. A man may suggest to another the amount which he wishes to be bequeathed to him, or what the testator may leave to others, if the testator's will is left free from restraint. A man cannot procure a will to be made by artifice or fraud. There is evidence that the testator complained of his brother Robert, but there is no evidence that his mind was poisoned against Robert by Charles. The imbecility of the testator cannot make that undue influence which would not have been undue influence if the testator had been otherwise. The weakness of mind in a testator might make its success more probable, but could not change its character.

"But there is another question: Whether the testator was of unsound mind or not? in which what took place at the execution of the will is an important part of the evidence.

"The testator, John Daniel, as it is shown, and is not denied, was a man of weak mind. Was his weakness of such a degree that it incapacitated him from making a valid will? Was he a man of sound and disposing mind and memory or not? The defendants say he was; the plaintiffs say he was not.

"An idiot is a person without understanding from his nativity —one incapable of acquiring a competent share of understanding, unless it be by the modes which a patient and ingenious benevolence has devoted in modern times. An idiot is incapable of making a will. But while a man need not have the highest, or even the ordinary degree of intelligence to make a will, he

[Daniel *v.* Daniel.]

may, on the other hand, be disqualified from making one, although he is neither an idiot nor a madman. The law has no precise gauge for the mental faculties. It cannot measure or weigh with precision that which is intangible or imponderable. It describes what it means by sound and disposing mind and memory as well as such a thing can be described, and leaves it to the intelligence and common sense of the jury to decide upon the evidence of it.

"A disposing mind and memory is one in which the testator is shown to have had at the making and execution of his will, a full and intelligent consciousness of the nature and effect of the act he was engaged in, a knowledge of the property he possessed, an understanding of the disposition he wished to make of it by the will, and of the persons and objects he desired to participate in his bounty. It is not necessary he should collect all these in one review. If he understands in detail all he is about, and chooses with understanding and reason between one disposition and another, it is sufficient. In deciding upon the competency of the testator in the evidence, the jury are not to consider the facts separately or isolatedly, but together. They will take into consideration the whole evidence of John Daniel's acts, conduct, speeches, conversation, behaviour, countenance, and appearance, and everything given in evidence in relation to him.

"The opinions of the witnesses as to his capacity or incapacity, are so far valuable as you may think they are justified by the facts which they respectively give as the basis of them."

In answer to the plaintiffs' points, the learned judge affirmed the first, seventh, eighth, and ninth, negatived the third, fourth, fifth, and sixth, and affirmed the second with this qualification: that testator's knowledge of his property need not be such that would enable him to specify in detail every kind of property which he possessed.

The defendants' points were disposed of by affirming the first, fourth, and sixth. The second and third were answered thus: "There may be imbecility of mind short of idiocy which does not incapacitate a testator to make a will. If he has the testamentary capacity I have described in the general charge, he is competent, however near to idiocy in the scale of intelligence it may place him. If the jury believe that, notwithstanding John Daniel approached as near an idiot as is described in second point, yet he was not an idiot, and had a testamentary capacity such as I have described, he would be competent. As to the fifth, it was pronounced "correct as far as it goes, but he should also understand the effect of the act he was engaged in."

Under these instructions, there was a verdict for the plaintiffs in the issue, and against the validity of the will; whereupon the defendants sued out this writ, and assigned for error here the following matters, viz. :—

[Daniel *v.* Daniel.]

1. The court erred in allowing the plaintiffs to ask Mr. Wright the following question, viz.: "Why could you have no conversation with him (meaning John Daniel) worth repeating, and explain what you mean by this?"

2. The court erred in allowing the plaintiffs to ask Mr. Wright the following question, viz.: "What was the shape and conformation of his head?"

3. The court erred in allowing the plaintiffs to ask Mr. Wright the following question: "Were you applied to by one of the defendants to write a will for John Daniel?"

4. The court erred in allowing the plaintiffs to ask Mr. Wright the following question: "State which of them applied to you?"

5. The court erred in allowing the plaintiffs to ask Mr. Wright the following question, viz.: "What conversation passed between you on this subject?"

6. The court erred in refusing to allow the defendants to ask Mr. Wright, on cross-examination, what was done with the petition for rescinding the decree in partition in Lehigh county?

This question had reference to a petition to rescind a decree of the Common Pleas of Lehigh county, in an action of partition, between Charles Daniel, one of the defendants, and Robert Daniel, a brother of deceased, who was his trustee, by which John's share in a tract of land which had been devised to them jointly, was directed to be paid to the trustee, in violation of the terms of the deed of trust.

7. The court erred in refusing to allow defendants to ask Mr. Wright the following question, viz.: "Were you not counsel for John Daniel in a proceeding in court originating in that petition?"

8. The court erred in allowing the plaintiffs to ask Joseph Dech to state the whole conversation which took place between him and the plaintiffs, as set forth in bill of exceptions.

The conversation referred to in this assignment of error, was in relation to the will of William Daniel, deceased, the father of the parties.

9. The court erred in allowing the plaintiffs to give evidence respecting the will of John Daniel's father.

10. The court erred in refusing to allow the defendants to read the alleged will of John Daniel, disputed in this proceeding, to Doctor Wilson, and thereupon to ask the witness whether or not, in his opinion, the said John Daniel had mental capacity sufficient to understand it.

11. The court erred in refusing to allow the defendants to ask Paul Schlegel the following question: "Had he (meaning John Daniel) or had he not, in your judgment, capacity enough to understand a will?"

[Daniel *v.* Daniel.]

12. The court erred in refusing to allow defendants to ask William Lee the following question: "Had he, or had he not, in your opinion, mind enough to know what he was doing in bequeathing his property?"

13. The court erred in refusing to allow the defendants to ask Edward Kiechel the following question: "Was he or was he not competent, in your opinion, to make a plain, ordinary will?"

14. The court erred in rejecting from the testimony of Jonathan Dewalt, the following answer: "From all these that I had to do with him, I believe he might have made a simple will like this."

15. The court erred in allowing Robert P. Brown to explain and state what were the difficulties which he had with Nathan Lerch, of which he had spoken in his cross-examination.

The difficulty between this witness and Mr. Lerch (a witness who had been called in support of the will, and whose character for veracity had been impeached by him) grew out of some alleged false representations made by Lerch eight or ten years before, in relation to Mr. Brown's conduct as scrivener, when called upon to write a will for Mr. Shoener, the father-in-law of Lerch.

16. The court erred in refusing to allow the defendants to ask George Frederick the following question: "Judging from what you have heard on both sides, what is his (meaning Nathan Lerch's) general character for truth among his acquaintances, and those who know him, according to your judgment?"

17. The court erred in refusing to allow the defendants to ask George Frederick the same question as stated in the last exception, after he had further testified, as set forth in the seventeenth bill of exception.

The "further testimony" referred to in this assignment of error was as follows:—

"I have often heard his character for truth talked about in the neighbourhood among his neighbours; perhaps I don't know the talk about him so well as some of his neighbours that live close to him; don't come into that neighbourhood sometimes for three or four months, sometimes not for six months; I have heard the general talk of the neighbours about his character for truth."

18. The court erred in refusing to allow the defendants to ask George Frederick the following question: "What do you call it (meaning Nathan Lerch's character for truth)—good or bad?"

19. The court erred in refusing to allow the defendants to ask Jonathan Dewalt the following question: "Taking the talk both ways, what is his general character for truth?"

20. The court erred in refusing to allow the defendants to withdraw the following testimony of Joseph Lichtenwalter: "I

[Daniel v. Daniel.]

have known Lerch eight or ten years; live almost a mile from him; am pretty well acquainted with him and his neighbours. I do not know his general character for truth—yes, I do—it is hard to tell what his character for truth is. I said it already—it was not the best—not good. They say that he mixes himself in things—heard it from his friends and enemies—that is what I mean when I say his character is not of the best—that is all I know about his character."

21. The court erred in not answering the defendants' second point.

22. The court erred in not answering the defendants' third point.

*Reeder* and *Green* for plaintiffs in error.—As to 1st and 2d assignments of error, argued: The testimony of Mr. Wright was improperly received, because it was as to matters which transpired between him and his client. The privilege as to professional communications is of the client, and not of the counsel, and nothing but the client's express waiver will suffice to make them admissible. The willingness of counsel to testify does not affect the question in any degree whatever, nor is it of any consequence that the client is dead: 1 Greenl. Ev. § 243. The entire professional intercourse between client and attorney, is protected: Id. 240°; and in whatever form it is made: 1 Phill. Ev. 169; Robson *v.* Kemp, 5 Esp. 52; Shellard *v.* Harris, 6 Carr. & P. 593; 24 E. C. L. Rep. 724; Parker *v.* Yates, Id. 520; 22 E. C. L. Rep. 647; Moore *v.* Bray, 10 Barr 519, 524-5; Starkie on Ev. 395; 3 Phill. Ev. 185.

3, 4, 5. The object of the evidence embraced within these assignments of error was to prove an admission by Charles Daniel, one of the defendants, that his brother John was incompetent to make a will, which is against the rule under which the declarations of one of several devisees to impeach a will are excluded on the trial of an issue *devisavit vel non:* Nussear *v.* Arnold, 13 S. & R. 323; Bovard *v.* Wallace, 4 Id. 499; Hawberger *v.* Root, 6 W. & S. 431; Dotts *v.* Fetzer, 9 Barr 88; Deitrich *v.* Deitrich, 4 Watts 167; 1 Greenl. Ev. § 176.

6, 7. If it was competent to show what the petition referred to in these specifications was, and to whom it was addressed, it was surely so to show what was done with it. The object in proving the character of the petition was to impair the testimony of this witness, by showing conduct on his part inconsistent with his alleged belief as to the insanity of the testator. Counsel may permit insane clients to sign petitions without much impropriety, but to present such a petition to court as a basis of judicial proceeding, indicated a belief on the part of the witness, by whom it was done, which would have weakened the force of his testimony.

[Daniel *v.* Daniel.]

8, 9. To show the feeling of the witness Dech, we asked him, on cross-examination, whether he had advised this proceeding, inquiring thus as to a fact. But the court below admitted evidence of a conversation respecting the will of William Daniel, which was totally irrelevant. The *reasons* for "causing this proceeding" were of no consequence; their propriety was not in issue.

10, 11, 12, 13, 14, 22. The specifications raise the same question, viz.: Whether the capacity of the alleged testator must be equal to the comprehension of the will he has made, or of all wills? It is very true, that the ordinary question put to a witness, when it is wished to give his opinion, is, whether he considers the deceased competent to make a will? But there is no rule of law, no decision of any court, that this is the *only* form in which that question can be put—and when we consider that the matter in controversy is the capacity of the alleged testator to make the will in dispute, it would seem clear that the only proper form of question would be, had he capacity to make *this* will?—for there is a vast difference in wills. A man may make a single devise of all his property to one person, or he may distribute his estate amongst a great many persons in different proportions, giving real estate to one, personal estate to another, a sum of money to this one, a specific legacy to that one. His legatees may be numerous, related to him in different degrees, or not related at all. He may wish to give his estate upon various and complicated uses, trusts, estates, conditions, and contingencies, or he may wish simply to divide its money proceeds among a few relations in equal proportions. His property may consist of a single piece of real estate, or of a definite sum of money, or it may be scattered over the world, and exist in a thousand different shapes, some parts of it quite familiar to him, others almost unknown. Surely, a man may have capacity to make one of these several kinds of wills, and yet not be competent to make another of them. For a very slight capacity only is required for one, and a much greater for another. A man, having a house in which he resides, and an only son to whom he wishes to devise it, is required to know his house and his son, and that he desires to give the house to the son, and need not necessarily know anything more to make a good devise. It certainly cannot be essential to employ any extended argument upon this subject. If the authorities assert that the capacity required in a given case is, so much as is necessary for the particular will in dispute, there is an end of the discussion, and this we propose to show.

In Stevens *v.* Vancleve, 4 W. C. C. R. 262, the court, after defining testamentary capacity in a general way, says, on page 268, "To sum up the whole in the most simple and intelligent

[Daniel *v.* Daniel.]

form, were his mind and memory sufficiently sound to enable him *to know and to understand the business in which he was engaged* at the time when he executed his will?"

It seems incredible, in view of this language, that the court below rejected the questions set forth in our 10th to 12th assignments, viz.: " Had John Daniel mental capacity sufficient to *understand it ?*"   " Had he, or had he not, in your judgment, capacity enough to understand a will?"   " Had he, or had he not, in your opinion, mind enough to *know what he was doing in bequeathing his property ?*"   These questions present the very idea, and are framed in almost the very words of this decision. It was argued that we should have asked as to Daniel's capacity to *make* a will.   But the making of a will means its technical execution in the broad legal sense; not writing it, not signing it, not even dictating it, nothing more than intelligently assenting to its provisions, and formally affixing his name or mark by the testator.   Aside from the mere manual formality of signature, which is nothing to the purpose of this discussion, there is nothing to which the phraseology " *making* a will" can apply, but its intellectual apprehension, the understanding it, the conception of its meaning.   The word " making" cannot be paraphrased in any other mode.   Its final essential import is, understanding, apprehending, knowing.   Hence it is, that in all the definitions, or descriptions rather, of testamentary capacity, this will be found to be not merely the fundamental idea, but the very language employed.   See Harrison *v.* Rowan, 3 W. C. C. R. 585; McMasters *v.* Blair, 5 Casey 298.

15. Our cross-examination of Mr. Brown, referred to in this specification of error, was to show feeling against Lerch, who had been examined in support of the will.   On this the court allowed the witness to enter on a long statement of their quarrels and difficulties, as was done when Mr. Dech was on the stand, in violation of the rule governing the cross-examination of witnesses in such cases. See 2 Phil. Ev. 399; 4 Id. 714, 717; Swift's Ev. 148.

16, 17, 18, 19. As to these assignments of error, we say, a man's character for truth is the predominating assertion of the neighbourhood, taking into account what is said for and against him.   General character is what is to be inquired into, not what particular persons say; and yet our questions framed in accordance with this rule, were excluded by the court below.

20. The testimony of Lichtenwalter, our own witness, who, by his last answer, expressly disqualified himself from giving any evidence of general character, we sought to withdraw, because if offered on the other side, it would have been rejected on our application.   The court refused to permit it, and we were injured

[Daniel *v.* Daniel.]

by unfounded testimony, which slipped in through the ignorance of the witness.

21. Our second point was framed to meet a possible exigency of the case upon the authority of Dornick *v.* Reichenbach, 10 S. & R. 84, and we cite, in support of it, Swinburne on Wills 127–8; Shelford on Lunacy 37, 39, 275; Stewart *v.* Lispenard, 26 Wend. 256, 298, 299, 300, 304. In the answer of the court below, the special and peculiar purpose of the point, the only thing that gave it vitality and meaning, was overlooked, disregarded, and unanswered by the addition of the words, "and had a testamentary capacity such as I have described." With these words the answer was a mere truism, which failed to reach the point.

22. We were entitled to a specific answer to our third point, and we were answered in substance that if John Daniel had testamentary capacity, he had capacity to make a testament. Our point was adapted to the exigency of the case, and our effort was to convince the jury that though John Daniel was of weak mind, he clearly understood his will, and was therefore competent. We were entitled to an answer on this point, but none was given which met it.

*Edward J. Fox* and *C. & M. Goepp*, for defendants in error.— 1. The rule which prohibits an attorney or counsellor from testifying to facts of which he had acquired knowledge through the medium of communications made in his professional character, is confined to *communications:* 1 Greenl. Ev. 714; Beeson *v.* Beeson, 9 Barr 301; Brandt *v.* Kline, 17 Johnson 338; Gillard *v.* Bates, 8 Dowl. 774; Green on Ev. 245; 3 Cowp. 846; Beckwith *v.* Benner, 6 C. & P. 681; Hurd *v.* Moring, 1 C. & P. 372; Rex *v.* Watkinson, 2 Stra. 1122; 1 Gr. on Ev. 237, 240; Sawyer *v.* Brickman, 3 M. & K. 572; Cowp. 846; 1 Phil. on Ev. 157.

It is also confined to cases where the client is interested: Hamilton *v.* Neil, 7 Watts 517.

2. The second specification is in the same category. John Daniel did not communicate his personal appearance confidentially to Mr. Wright. His appearance, the shape of his head and face, and the expression of his countenance, were evidence as part of the *res gestæ:* Pearson *v.* Wilkinson, 11 Harris 119; Irish *v.* Smith, 8 S. & R. 578.

3, 4, 5. The plaintiffs in error were not injured by the questions complained of, because no evidence was received under them. Charles Daniel made an admission or declaration as to his brother's capacity to make a will. The evidence was offered to prove the undue influence and imposition alleged in the *narr.*, and any act tending to prove this was proper. The visit of Charles to Mr. Wright was a link in the chain of circumstances

[Daniel v. Daniel.]

which established it. It was Charles who procured the scrivener, and in effect dictated the will. Mr. Wright refused to act in the matter, and the reason given by him for his refusal was confirmatory of the opinion given on the trial as to John's incapacity, and for that reason was properly admitted.

6, 7. We had these objections to the testimony referred to in these specifications of error: 1. It was not cross-examination; and, 2, It was irrelevant: See 2 Phil. Ev. 903; Camabre v. Caze, 1 W. C. C. R. 413. Besides this, the proceedings on the petition were matters of record, and could not be proved in this way.

8, 9. As the other side had drawn from the witness part of a conversation, we were entitled to the rest of it, and for this reason the evidence complained of here was properly admitted: Bank v. Donaldson, 6 Barr 179.

10, 11, 12, 13. To these we answer, that a witness must speak to facts, and that opinions, without giving their ground, are not evidence: 1 Phil. Ev. 778; Rambler v. Tryon, 7 S. & R. 92. The usual question allowed by the court in such cases is this: "Whether, from your actual knowledge of the decedent, you consider him fit to make a will?" Wogan v. Small, 1 S. & R. 143.

The important point upon which all these assignments of error are made to turn, is this: the defendants below contended for the position that there may be different degrees of testamentary capacity,—that a man may be legally competent to make a plain and simple will, whilst legally incompetent to make an intricate one,—that he may have capacity in law to make a will of one kind when he has not capacity in law to make a will of another kind; and they complain that this position was not, as they say, so fully acceded to by the court below as it should have been.

This position strikes the mind as novel. The line of demarcation between testamentary capacity and incapacity has generally been supposed to be fixed and determined, though it is often a matter of extreme nicety to ascertain on which side of it a given case lies. That a man should be held sufficiently *compos mentis* to make a will containing certain provisions, but not sufficiently *compos mentis* to make a will containing certain other provisions, is startling. Such a doctrine makes the boundary line between sanity and insanity (for testamentary purposes) a shifting and wavering thing.

A man's capacity (his *actual* ability, not his *legal* competency) to understand a certain will, when it is laid before him, depends upon his previous education, and his intellectual strength or knowledge. A layman may be perfectly able to inform his counsel of the provisions he wishes to make, and yet be unable to say, when he hears the document read to him, whether the legal

[Daniel *v.* Daniel.]

phraseology employed does or does not express his intentions. The bequests in a will may, in certain contingencies, draw after them consequences which none but lawyers (and, perhaps, not all of them) can fully foresee and comprehend. Shall it, therefore, be the law that none but lawyers shall be held legally competent to make *such* wills? To qualify a layman to make his will, it would then be necessary that he should go through a course of reading and study on executory devises, contingent remainders, uses and trusts, entails and the statutes by which they can be barred, the rule in Shelley's case, and kindred subjects. A very illiterate man would be qualified to make a will of one sort; a man of more education, one a little more intricate; a lawyer, one still more complicated; and wills of the highest and most involved description would be the especial privilege of judges of the Supreme Court.

If this position were admitted, how could the conclusion be avoided that every will must be set aside if the testator is shown to have availed himself of an intelligence, professional or otherwise, superior to his own?

The case of McMasters *v.* Blair, 5 Casey 298, does not seem to recognise any such distinction.

In Stevenson *v.* Stevenson, 9 Casey 469, the court below had said that, to constitute testamentary capacity, the party must have, amongst other things, a recollection "of the persons who were the natural objects of his bounty, and the manner in which it was to be distributed," and for this chiefly the judgment was reversed. It is plain that the ruling of the court below would disqualify every man who had forgotten any of his relatives, or did not understand the statute of distribution of the estates of intestates.

15. The witness, Mr. Brown, having impeached the credit of Nathan Lerch, in cross-examination, said, "Can't say that we are on good terms; have had difficulties with him." The witness then asked permission of the court to explain the difficulties. Permission was granted, and he availed himself of it. It was his privilege to do so; and if the court below, in their discretion, allowed him the use of the public time for the purpose, it is hard to see why the matter should be remedied by taking time to re-try the whole case between plaintiffs and defendants.

16, 17, 18, and 19. The unfortunate use of the word "character" in place of "reputation," has introduced into the rules of law, respecting the inquiry into a witness's credibility, an apparent obscurity, which leads to a constant renewal of argument and disputes, though it never leads to any unsettlement of the law. The order of interrogation is strictly prescribed, as follows:—

1. Do you know the witness?

[Daniel *v.* Daniel.]

2. Do you know his general reputation for truth and veracity?

3. What is his general reputation for truth and veracity?

4. From what you know of his general reputation for truth and veracity, would you believe him on oath?

No one of these questions can be put until all those preceding it have been affirmatively answered. Here George Frederick distinctly declined to answer the second question in the affirmative. The defendant below made two abortive attempts to put the third, but succeeded in getting all they could have got by success, for they elicited an affirmative answer to the fourth question, to which the others were only introductory. Most clearly no error was committed; but if it had been, the plaintiffs in error have obtained all the advantages they could possibly have had under another decision.

Richard Snyder testified, " I know what the people say of his character for truth; some say it is good, and some bad." This is tantamount to saying that he had no *general* reputation. It was therefore manifestly improper to ask whether that general reputation, which did not exist, was good or bad.

But as the witness, after all, said that he would believe Nathan Lerch under oath, there is nothing whatever of which the plaintiffs in error could complain.

Jonathan Dewalt was not permitted to be asked, " Taking the talk both ways, what is his general character for truth ?" What better answer could the exceptants have elicited than that his general character for truth was good? He had already said, " I know what the people generally say about his character for truth. I can't say otherwise than that his character for truth is good." And before he left the stand he said, "I must believe him under oath." What could the plaintiffs in error gain by a reversal of the judgment?

20. The plaintiffs below had called witnesses to prove the insanity. The defendants below had called Nathan Lerch to swear to sanity. The defendants below then called a number of witnesses to impeach the reputation of Nathan Lerch for truth and veracity. In rebuttal, the defendants below called Joseph Lichtenwalter, who testified as stated in this specification, in which there are at least two expressions to qualify the witness where there is one tending to disqualify him. The task of judging between the two was for the jury, from whom the court could not have taken it—least of all, on the application of the party who had produced the witness.

21. The defendants below made the point that " a man may have great imbecility of mind, and approach so nearly to idiocy, as to make it difficult to distinguish him from an idiot, and to lead ordinary observers into the belief that he is almost an idiot, and yet be competent to make a will."

[Daniel *v.* Daniel.]

The court answered, that "if the jury believe that notwithstanding John Daniel approached as near an idiot as is described in 2d point, yet he was not an idiot, and had a testamentary capacity such as I have described, he would be competent." Could there be a more unqualified affirmation? The plaintiffs in error, without denying the correctness of the answer, object to the words "and had a testamentary capacity such as I have described," which they say reduces it to a mere truism, and frustrated the peculiar purpose of the point, which, with the omission of those words, would have been obtained. The peculiar purpose of the point must then have been to induce the court to say that no matter how feeble-minded the testator was, if he was not an "idiot" he was competent to make a will. Such an answer would have been a departure from the law.

22. The defendants below asked the court to charge that "to set aside a will on the ground of idiocy, it must be shown that the testator was an actual idiot, or of so great imbecility of mind approaching so near to idiocy as that he is unable to understand the will which he has made."

Various answers might have been given to this point. It might have been said that a will is never set aside "on the ground of idiocy," and therefore nothing is ever required to be shown for that purpose, or that it is never legally necessary to show that a man is an "actual idiot," or that the words idiot and idiocy are mere redundancies in the point, obstructing the understanding of its meaning. Stripped of these caparisons, it would read, "to set aside a will, it must be shown that the testator was unable to understand the will which he has made." Now, if this point ought to have been denied, no answer that the court can possibly have given can lay ground for a writ of error.

What must be shown is incapacity to *make* a will. That is beyond dispute. If incapacity to understand a will after it is made, is a greater degree of incapacity than incapacity to make a will that has as yet no existence, then, inasmuch as the greater includes the less, the point would be correct, and a contestant would fail of a recovery who had *not even* shown the *lesser* degree of incapacity. But if, on the contrary, it takes more wit to originate a will than to understand it after it is made, or if incapacity to do the latter evidences the greater degree of incapacity, then the point was incorrect, because a contestant is not required to do *more* than to show that the testator was unable to *make* a will. Now, which is more difficult, to *originate* a will having as yet no existence, or to *understand* a will that has been made already? In other words, is it harder to solve a problem, or to understand the solution after it is accomplished? The question answers itself. The point ought to have been nega-

[Daniel *v.* Daniel.]

tived, but it was not by any means so positively as it might have been.

Substantially, perhaps, it was negatived. The plaintiff in error says that the answer was substantially that, if the testator had testamentary capacity, he was competent to make a testament. The answer was not only true, but apposite. Had the antithesis been brought into more relief, the answer would have been that to set aside a will, it is not necessary to show that the testator could not even understand a will after it had been made for him, but only to show that he could not devise a disposition of his property, not suggested to him by others. Such, in substance, *was* the answer.

The opinion of the court was delivered, May 6th 1861, by

WOODWARD, J.—The issue was *devisavit vel non*. The paper, purporting to be the last will of John Daniel, deceased, was assailed by the plaintiffs on two grounds: first, on the ground that he was so imbecile and idiotic as to be incapable of making a will; and, secondly, that the will was procured from him through undue influence and imposition exercised by his brother, Charles Daniel, who is one of the executors and principal legatees.

After a great deal of evidence was given on both sides, the court withdrew the second of the above questions from the consideration of the jury, by telling them that there was no evidence of undue influence, and submitted the question of the testator's capacity in a charge which stated, with great fairness and clearness, the established legal distinctions upon the subject of testamentary competency. Of the twenty-two errors assigned, the last two are the only ones that relate to the charge. These complain that the second and third points, on the part of the defendants, were not answered by the judge; but, on looking through the general charge, we think it was quite as favourable to the defendants on the subject of mental capacity, as, under the evidence in the cause, they had a right to demand. And, moreover, their second and third points were substantially affirmed in specific answers made thereto. The doctrine of these points was, that the imbecility which incapacitates for a testamentary act, must approach so near to actual idiocy as not only to lead ordinary observers to the belief that the individual is almost an idiot, but to show also that he is unable to understand the will he has made. The court responded that there may be imbecility of mind short of idiocy, which does not incapacitate a testator to make a will, and referred the jury to the standard of testamentary capacity explained in the general charge. In the charge, a disposing mind and memory was described to be " one in which the testator is shown to have had, at the making and execution of

[Daniel *v.* Daniel.]

his will, a full and intelligent consciousness of the nature and effect of the act he was engaged in—a knowledge of the property he possessed—an understanding of the disposition he wished to make of it by the will, and of the persons and objects he desired to participate in his bounty. Is is not necessary he should collect all these in one review. If he understands in detail all he is about, and chooses with understanding and reason between one disposition and another, it is sufficient."

What fuller or more favourable answer had the defendants a right to expect? Their proposition, that testamentary capacity might accompany mental imbecility down to almost actual idiocy, was affirmed, and the jury was instructed to exact of the alleged testator no more than an understanding of the testamentary act he was engaged in performing. When a man is spoken of as understanding the will he is making, it is never meant that he comprehends the possible legal effect which lawyers and judges may impute to the words he employs. The nicest and most difficult questions in law frequently arise upon the construction of wills. Testamentary capacity does not necessarily include an ability to grapple with such questions. Nor did the learned judge suggest any such test. But he put the question to the jury, as defendants' counsel desired him to put it, as involving merely an understanding on the part of the testator of what he was about, and an intelligent choice between one disposition and another. And yet the defendants complain of this as error! If the judge had required the jury to find capacity to understand wills in general, or to construe the legal effect of all the provisions in the instrument under consideration, there might have been reason to complain; but, in view of what was laid down by the judge, the defendants had as good a chance for the verdict as the abstract rules of law could possibly afford them.

The difficulties of their case, and their failure to get the verdict, did not spring out of the rules of law announced from the bench, but from the evidence in the cause. Besides the mass of evidence on the part of the plaintiffs which went to establish extreme imbecility, almost blank idiocy, against the testator, there were the two principal witnesses on the part of the defendants themselves, Dr. Wilson, the attending physician, and Rauch, the scrivener who drew the will, whose testimony was calculated to shake the confidence of the jury in the testator's competency. An imbecile who could not express the simplest ideas without misplacing his words, according to the testimony of witnesses who had known him all his life, was dying of consumption and typhoid fever. Three, or at most four, days before he died, Esquire Rauch was brought to his bedside in Charles's house, not by any request of the dying man, but by Charles himself. "I came into the room," says the witness, "and Charles

[Daniel *v.* Daniel.]

Daniel went out again, I think to take his dinner. There was one lady in the room whom I don't know, but suppose it was Charles's wife. John Daniel was in bed. I went up to the bed-side, and asked him what he wished me to do. His answer was: "*Der Charles wess*"—Charles knows. So I waited until Charles came in again. When he did so, he said to John: "Now here is the man whom I have brought to write your will." Charles told him to tell me what he wanted—something to that effect. Then he told me Charles and Ephe were to have share and share alike. Charles asked him: "How much are Ephe and I to have —$2000, $3000, $4000, $5000, or $6000?" John said $6000. I hesitated a moment, and looked at Charles. Charles then told me to put down $5000." Without quoting more of this witness's testimony, this specimen is sufficient to show how little John Daniel had to do with making his will. He generally adopted the last sum suggested in Charles's peculiar interrogatories, though the scrivener put down the sum Charles dictated, as if he was making a will for him instead of John. The nomination of executors was doubtless accomplished in the same manner.

That the jury should have failed to find testamentary competency in a case which could not be made to wear any better visage than that, is not to be wondered at. And that the court might have dealt with the proofs in a much more damaging way than they did, is shown by what Swinburne wrote long ago: "The third case of incompetency is when he that is at the point of death, and hardly able to speak so as he may be understood, doth not of his own accord make or declare his testament, but at the interrogation of some other, demanding of him whether he make this or that person his executor, and whether he give such a thing to such a person, answereth Yea, or I do so. In which case it is a question of some difficulty whether the testament be good or not, neither can it be answered simply either negatively or affirmatively, but diversely in divers respects. For if he who doth ask the question of the testator be a suspected person, or be importunate to have the testator speak, or make request to his own commodity, as if he say, do you make me your executor, or do you give this or that, and thereupon the testator answer yea—in this case it is to be presumed that the testator did answer yea rather to deliver himself of the importunity of the demand-ant than upon intent to make his will, because it is for the most part painful to those that be in that extremity to speak or be demanded any question, and therefore they are ready to answer yea to any question almost, that they may be quiet. Which advantage crafty and covetous persons knowing very well, are then most busy and do labour to procure the sick person to yield to their demands when they perceive he cannot resist them, neither hath time to revoke the same afterwards, being then

[Daniel *v.* Daniel.]

passing to another world. And therefore with great equity and reason is that to be deemed for no testament when the sick person answereth yea, the interrogation being made by a suspected person, as well in respect of presumption of deceit in the one as of defect of meaning a testament in the other."

And to illustrate these observations, an old case in time of Henry VIII. is referred to, where a monk came to a gentleman then *in extremis*, to make his will. The monk asked the gentleman if he would give such a manor to his monastery? The gentleman answered yea. Then, if he would give such and such estates to such and such pious uses. The gentleman answered yea to them all. The heir-at-law observing the covetousness of the monk, and that all the estate would be given away, asked the testator if the monk was not a very knave, who answered, yea. Afterward, for the reasons above said, it was adjudged no will: Swinburne on Wills, fol. ed., p. 112.

Now it would not be right to treat Charles as a "suspected person," nor to set up any presumption of deceit to his prejudice, after the effectual manner in which the court put the second question touching undue influence out of the cause; but this venerable authority shows us how to apply the essential facts of the case to the question of the testator's competency. If the will was procured by the interposition and dictation of Charles, that fact connects itself with the congenital imbecility and dying condition of the testator, and goes strongly to condemn the paper. But more than this. Such a result, drawn from the essential facts of the case, shows how very unimportant are many of the technical questions of evidence raised by the bills of exception. If we were to say the court erred in every of the twenty instances alleged—that they should have admitted what they are complained of for excluding, and should have excluded what they are complained of for admitting—we do not see that a different result could have been looked for. So decisive against the competency of the testator are the main, uncontradicted, and unquestioned proofs in the cause.

But let us pass rapidly through the bills of exception, and see what they contain. The first seven errors assigned relate to Mr. Wright's testimony. It seems that Mr. Wright had been counsel for the testator—not employed by him, but by his brother Samuel to act for him—who frequently came to his office, but always in company with others. Mr. Wright says he never had any conversation with John in his life, nor could have any worth repeating. It was then proposed to ask why he could have no conversation with him, and the question was admitted under exception.

The idea of counsel seems to be that the professional relation forbade the answer to this question. Communications made to counsel are privileged; but if a client is too imbecile to make

any communications, I never before heard that that fact was incompetent testimony on account of the professional relation. No more than the shape of the client's head, which is the subject of the next bill. If a lawyer learns from professional visits that he has a fool for a client, whether he acquires the knowledge by the want of intelligent answers, or by study of phrenological developments, the fact is competent evidence in a proper case, and no rule of law forbids the lawyer from delivering it.

Some inquiries were pressed on this witness in regard to the declarations of Charles Daniel, which, if they had drawn out admissions of the testator's incompetency, would have rendered the rulings of the court mischievous. For it has been often decided that the admissions of one of several defendants, in an issue of *devisavit vel non*, cannot be given against the others. But it is to be remembered that the issue as to undue influence was cast out of the cause, and therefore no erroneous rulings of evidence that was intended to bear on that point are of the least consequence. And as to mental competency, which was the only point decided, Mr. Wright detailed no admissions or declarations of Charles.

All that was proved or offered to be proved about the petition to rescind a certain partition was utterly irrelevant to the only issue that was decided.

And the same remark is applicable to the evidence referred to in the eighth and ninth assignments. Whilst it might possibly have had some pertinency to the issue about undue influence, it was irrelevant to that about testamentary capacity, and therefore harmless. The defendants got the benefit of their objections to this evidence, by inducing the court to exclude from the consideration of the jury the only topic to which it could apply. Their argument that it was irrelevant as to the remaining topic is sound enough, but no reason for reversing the judgment; for the ready answer to such an argument is, that as the evidence touched not that topic, it did you no injury.

To show a fully drawn will to a physician, and to ask him whether his patient had mental capacity to understand it, is an unusual mode of examining a doctor. Whether the court erred in excluding it, is not necessary to be decided; for Dr. Wilson had declared, before the question was addressed to him, that he had no idea of what intellect was required to make a will. Of course he could not have answered the question had the court allowed it to be pressed.

The next assignment complains that the court would not allow Paul Schlegel to be asked whether the testator had capacity "to understand a will." The witness was allowed to answer, and did answer, that he was "fit to make a will." We think that throughout this cause there was too much refinement of distinc-

[Daniel *v.* Daniel.]

tions in raising and ruling questions of evidence on the part both of counsel and of court; and here is a remarkable instance of excessive nicety. What is the distinction between that mental condition which is competent to understand a will, and that which is fit to make a will? If a microscopic vision could detect a distinction, who has scales nice enough to tell how much it would weigh in the jury box? The plaintiffs in error undertake to convince us that their cause was damaged by the witness testifying that the testator was fit to make a will, instead of testifying that he was competent to understand a will. We do not think the error, if error there was, did them any damage. We do not suppose the jury would have been swayed a hair's breadth by one form of answer, more than by the other.

And the bill sealed on part of William Lee's testimony, was another instance of excessive refinement. The defendants were not permitted to ask the witness if the testator had mind enough "to know what he was doing in bequeathing his property," but the witness was permitted to testify that "he was fit to bequeath his things to Charles and Ephraim, because he said that Robert and Joseph would not get much." Again, we ask, what is the difference between the testimony offered and the testimony delivered? And was it a damaging difference? We think it was not.

The thirteenth assignment of error is, that defendants were not permitted to ask Edward Kiechel whether testator was competent to make a plain, ordinary will. I confess I do not see why the question was excluded; but the witness gave a very good reason why we should not reverse for this error, when he said: "My opinion is, he was not fit to make a will giving away his property." As they would not have got the answer they sought, the defendants were unharmed by the loss of their question.

The particular answer excluded from Dewalt's testimony, did not materially impair the effect of his evidence, and is quite too inconsiderable a point to rest a judgment of reversal upon.

The rest of the assignments relate to a side issue on the character of one Nathan Lerch, who was not a party to the record, nor, so far as we are shown, a witness in the case to anything more than a matter of opinion. We will not be betrayed into a consideration of any of the rulings in that side issue.

Having thus gone over all the assignments of error, we find nothing in them to require a reversal of the judgment, and it is accordingly affirmed.